## BROOKS *vs.* THE STATE.

[INDICTMENT FOR SELLING SLAVES WITHOUT LICENSE.]

1. *License as auctioneer no authority to sell slaves as agent or broker.*—A licensed auctioneer, who is also engaged in the business of selling slaves as agent or broker, is within the provisions of the statute (Code, § 397, ¶ 17) respecting the sale of slaves "by a negro-trader, broker, or agent for the sale of slaves"; and the fact that the owner of the slave was present at the sale, and executed the bill of sale to the purchaser, is no protection to him.

FROM the City Court of Mobile.

Tried before the Hon. ALEX. MCKINSTRY.

THE indictment in this case charged, that Augustus Brooks, "being a negro-trader, broker, or agent for the sale of slaves, sold, offered, or exposed for sale a slave named Rufus, the property of Jason H. Carson, without a license, and contrary to law." On the trial, as the bill of exceptions states, "the State introduced the defendant's clerk as a witness, who testified, that the defendant was an auctioneer, doing a general business, and selling real estate, slaves, furniture, and whatever was sent to him for sale; that he has been doing this for several years; that he sold, during the year last before the trial, more than one hundred slaves for other persons, most of them as auctioneer, and some privately; that some of those sold privately were for persons living out of the State; that when slaves were sent to him for sale, he boarded them with a Mrs. Moseley, paid their board, and charged it to the owner on settlement; that he had an office and place of business on Royal street in the city of Mobile, opposite the court-house, where slaves sent to him for sale were generally kept during the day, exposed publicly to the view and examination of those wishing to purchase, and where they were sometimes sold privately when the price would be agreed on. It was further shown, that the slave sold belonged to Jason H. Carson, a resident of North Carolina, and had been lately brought into this State; that said Carson brought this slave, with a number of others, to Mobile for sale; that defendant agreed to sell them, and advertised the sale regularly, through the newspapers and hand-bills; that these slaves were boarded at a place called the 'Eutaw house,' on Royal street, nearly opposite to defendant's place of business, where a sort of negro boarding-house is now kept; that Carson was sent or recommended to this house by defendant, but paid the bills for board himself; that defendant sold the slave Rufus, on the day advertised, 9th February, 1857, in front of the court-house in Mobile, at public auction; that Carson was present at the time, and executed the bill of sale to the purchaser on settlement with defendant. The proof showed, also, that defendant had a license as auc-

tioneer, granted to him by the probate court of Mobile, dated March, 1856, for the term of one year."

"On this testimony, the court charged the jury, that if they believed the defendant was a negro-trader, broker, or agent for the sale of slaves; and that he sold the slave Rufus, on the 9th February, 1857, in Mobile county, without a license to sell said slave,—then he was guilty, and his general license as auctioneer did not relieve him in this case, if they found the facts as in the first part of this charge.

"The defendant excepted to this charge, and requested the court to instruct the jury as follows:

"1. That if they believed that defendant sold said slave as an auctioneer merely, the owner being present at the sale, and making the title to the purchaser, then defendant is not liable.

"2. That if they believed that defendant had nothing to do with the slave except to sell him at auction, he being a licensed auctioneer, the owner being present, and making title, then he was not liable.

"The court refused to give either one of these charges, and the defendant excepted to each refusal."

E. S. DARGAN, for the appellant.

M. A. BALDWIN, Attorney-General, with whom was ROBERT B. ARMISTEAD, *contra*.

STONE, J.—We propose to determine the construction of section 397 of the Code, subdivision 17, and the effect of the act amendatory thereof, approved February 7th, 1856; and afterwards, to apply the law to the facts of this record.

Section 397 fixes the prices of licenses to conduct various descriptions of business, from which revenue is proposed to be derived. Subdivision 17 relates to *negro-traders, brokers, or agents for the sale of slaves*. We apprehend no contest can arise on the meaning of the term *negro-trader*. If any difference of opinion exists, it must be as to the proper construction of the terms *broker* and *agent*.

These terms, *broker* and *agent*, in their most general signification, are very broad. The first embraces a class of agents of very extensive and diversified pursuits.—See Story on Agency, § 28; 1 Bouv. Law Dict. 194. The term *agent* has a more extended signification; comprehending brokers, and all other persons who act for another.—1 Bouv. Law Dict. 84–5. If we give to these expressions their general meaning, the result will be to levy a tax upon many of the pursuits of life, some of which are taxed otherwise, and others we cannot suppose were intended to be taxed.

We think the context, and the connection in which these words are found, determine the sense in which they were employed by the legislature. Traffic in slaves, as a business, or employment, was the subject under consideration; and we think the language relates to nothing else. It was not intended to exact a license from the brokers or agents of negro-traders, by virtue of the relation they sustained to such negro-traders. Possibly, another legal principle, after noticed, will bring them under the influence of this section, at least to a limited extent. The intention was, to derive revenue from the *business*—the *traffic*—in slaves by *negro-traders*, *brokers*, (for the sale of slaves,) and all other *agents* for the sale of slaves. It is only those brokers and agents who are, as such, engaged in the sale of slaves, as a business, who are provided for in the section of the Code we are considering.

It is not necessary that the sale of slaves shall constitute the entire business of such agent or broker. It is sufficient that it is with him a business, although it may be conducted in conjunction with some other pursuit or employment.

An auctioneer, as well as a broker, is a species of agent; many of his powers are very analogous to those of a broker.—See 1 Bouv. Law Dict. 141–2. They are embraced under the term agent in section 397, subdivision 17.

The statute approved February 7th, 1856, (Pamphlet Acts, 25,) had no other design, and has no other effect, than to exempt from license and tax the sale and offer for sale of slaves, even by traders, brokers, auctioneers and

agents engaged in that business, provided the slave so sold, or offered to be sold, is the property of a citizen of this State, and such citizen has owned said slave in this State for one year preceding such sale or offer to sell; and provided further, that the affidavit required by that statute is made and filed in the proper office.

It is manifest that the general auction license, which the plaintiff in error had obtained from the probate court of Mobile county, gave him no authority to sell slaves as an agent, broker, or auctioneer *for the sale of slaves;* or, as we construe those words, an agent, broker, or auctioneer, engaged in the business of selling slaves. The two employments are entirely dissimilar, and are not rated alike. The price of a license to carry on the business of an auctioneer throughout the State, for one year, is twenty dollars; the license to sell slaves, or offer them for sale, ten dollars a head. We concur with the counsel for the defendant in error, that as well might a licensed auctioneer claim the right to sell to the highest bidder, and without other license, ardent spirits in quantities less than one quart, as to engage in the business of selling slaves, either publicly or privately, as agent, broker, or auctioneer.

The affirmative charge given in the court below is in strict conformity with these views. The two charges asked and refused, base the defendant's right to acquittal on the hypothetical ground that he was a licensed auctioneer, and that he sold the slaves simply as auctioneer, the owner being present, and executing the titles. We have shown that, if the auctioneer was engaged in the business of selling slaves, the fact that he was simply acting as the agent of another affords him no protection. There was proof tending to show he was so engaged; and under the charge, that question was submitted to the jury.

There are two phases which this question may assume, and which are not presented by this record. We propose to state them, for the purpose of saying expressly that we do not now decide them. First, when the auctioneer is engaged in the business of selling slaves, and has no license for such sale of slaves, if the owner himself have

a license, will this operate a protection of the auctioneer ?
Second, when the negro-trader has no license, and the
auctioneer is not engaged in the business of selling slaves,
and has no license therefor, will a sale under these cir-
cumstances, the owner being present, and the auctioneer
performing no other function than to cry the slaves, con-
stitute him a principal with the owner in violating the
law ?   On this last point, the doctrine is well settled, that
in States where the retail of spirituous liquors without
license is prohibited, it is no defense to the seller that he
acted only as the agent of another, unless that other had
a license.—Roberts v. O'Conner, 33 Maine, 496 ; State v.
Bryant, 14 Missouri, 340 ; Geuing v. The State, 1 McCord,
573; Hays v. The State, 13 Mo. 246 ; State v. Bugbee,
22 Ver. 33; Commonwealth v. Hadley, 11 Metc. 66 ;
Smith v. The State, 5 Humph. 163.   On the other hand,
in all the States where this doctrine has been asserted, no
person is authorized to sell liquors at retail without first
obtaining a license.   In this State, all persons, except the
class prohibited by the statutes above referred to, may sell
slaves, either publicly or privately, without obtaining a
license.   Whether an auctioneer will be excused, if he
act without notice of the fact that his principal is one of
a class who cannot sell without a license; or, whether he
must, at his peril, see that he does not aid in an evasion
or violation of the law, we decline now to decide.

There is no error in the record, and the judgment of
the city court is affirmed.